**Kerry J. Shepherd, OSB #944343**
KerryShepherd@MarkowitzHerbold.com
**Allison L. Rothgeb, OSB #222086**
AllisonRothgeb@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CITY OF LEBANON, an Oregon municipal corporation; and CITY OF SWEET HOME, an Oregon municipal corporation,<br><br>                   Plaintiffs,<br><br>   v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,<br><br>                   Defendant. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF ADMINISTRATIVE PROCEDURES ACT, CLEAN WATER ACT, AND MONETARY DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Page 1 –     COMPLAINT

Plaintiffs, the City of Lebanon and City of Sweet Home, for their complaint against defendant United States Army Corps of Engineers, allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, City of Lebanon ("Lebanon"), is a municipal corporation organized and existing under the laws of the State of Oregon and has standing to be a party to this lawsuit.

2. Plaintiff, City of Sweet Home ("Sweet Home"), is a municipal corporation organized and existing under the laws of the State of Oregon and has standing to be a party to this lawsuit.

3. Defendant is the United States Army Corps of Engineers ("the Corps"). The Corps is tasked with, *inter alia*, managing water resources in the Willamette Valley Basin. The Corps owns, operates, and maintains the Willamette Valley Project ("WVP"), a system of 13 dams along the Willamette River. The Corps maintains an office in Portland, Oregon that serves as the headquarters of the Northwest Division, which includes five of its districts, including the Portland District. The Portland District of the Corps is responsible for operating the dams that comprise the WVP.

4. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action presents a federal question under the Clean Water Act, 33 U.S.C. § 1251 *et seq*.; under 28 U.S.C. § 1346 because this action involves the United States as a defendant; and under the Administrative Procedure Act ("APA"), which confers a right of judicial review on any person adversely affected by a federal agency action. 5 U.S.C. §§ 701-706.

5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 for all other claims that form part of the same case or controversy, including claims arising under Oregon law.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district and a substantial part of the property that is the subject of the action is situated herein.  Venue is proper in the Portland Division of this district because operation of the dams in the Willamette Valley Basin is directed from the Corps' Portland District, headquartered in Portland, Oregon.

7. By letters dated October 11, 2024, plaintiffs satisfied the notice provision of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2674, 2675, such that plaintiffs may bring this action upon final agency disposition of their claims.

## GENERAL ALLEGATIONS

8. The South Santiam River is located in the Upper Basin of the Willamette River,[1] in an area east of the Willamette River and between Salem (to the north) and Eugene (to the south).  The Corps operates two dams on this waterway, Green Peter and Foster, the construction of which were completed in 1967 and 1968, respectively.

9. Before the South Santiam River reaches its confluence with the Willamette River, it flows into the Green Peter Reservoir, a reservoir created by Green Peter Dam.  This reservoir is authorized to serve several purposes, including providing water supply.

10. Through operation of Green Peter Dam, water is released back into the South Santiam River where it continues to flow until it reaches Foster Reservoir, a reservoir created by Foster Dam.  This reservoir is authorized for the same purposes as Green Peter Reservoir.

---

[1] Because the Willamette River flows south to north, the Upper Basin is below Willamette Falls whereas the Lower Basin is above it.

Page 3 –     COMPLAINT

11. Through operation of Foster Dam, water is released back into the South Santiam River where it continues on its path toward the Willamette River. The flow of the South Santiam River past the two dams is depicted in the image attached hereto as Exhibit 1.

**(The South Santiam River supplies water to Sweet Home and Lebanon)**

12. Sweet Home is located approximately 11 miles from Green Peter Dam and four miles from Foster Dam. Lebanon is located approximately 14 miles from Sweet Home along the South Santiam River. The South Santiam River is the primary source of both Sweet Home's and Lebanon's municipal water supplies.

**(Sweet Home's water treatment facility is not designed for highly turbid water)**

13. To provide a safe municipal water supply, including drinking water, Sweet Home treats water supplied by the South Santiam River at its water treatment facility. Water from the South Santiam River is put through a filtration system comprised of three primary filters.

14. The water supplied by the South Santiam River has historically been of high quality with low turbidity levels. Sweet Home designed its water treatment facility to treat water with these characteristics. Because of the low turbidity typical of the South Santiam River, Sweet Home's water treatment facility was not designed to accommodate a high sediment load resulting from a highly turbid water source.

15. When Sweet Homes' water supply from the South Santiam River has excess sediment, as defendant caused and will continue to cause per the allegations herein, the treatment system can malfunction and/or stop working completely.

**(Lebanon's water treatment facilities are not designed for highly turbid water)**

16. To provide a safe municipal water supply, including drinking water, Lebanon treats the water supplied by the South Santiam River at its water treatment facility. Water from the South Santiam River is put through a filtration system comprised of cartridges.

17. Because the South Santiam River has historically had low turbidity levels, Lebanon's water treatment facility is not designed to treat highly turbid water. When the water supply has excess sediment, it builds up in the filtration cartridges and causes a dangerous level of pressure in the filtration system.

18. When Lebanon's water supply from the South Santiam River has excess sediment, as defendant caused and will continue to cause per the allegations herein, the treatment system can malfunction and/or stop working completely.

**(Oregon's water quality standards are governed by federal and state law)**

19. To comply with the Clean Water Act ("CWA"), each state must develop and implement water quality standards that protect and enhance the quality of water within the state. Federal agencies are, in turn, required to comply with these legal standards. As such, the CWA requires that the Corps comply with the water quality standards established by Oregon law.

20. Oregon's water quality standards are expressed in a variety of ways: as the designated beneficial uses of a given waterway; as numeric criteria that may vary based on location; as narrative criteria that apply statewide; and in the generally applicable antidegradation standard.

21. Under Oregon law, a designated beneficial use is the purpose or benefit to be derived from a body of water as designated by the appropriate state agency. A given waterway will have multiple designated beneficial uses. The Willamette Basin, including the South Santiam River, is designated for the following beneficial uses: as a public, private, and industrial water supply, and to support fish and aquatic life.

22. The numeric criteria that regulate water quality are set forth in the Oregon Administrative Regulations ("OAR"). With respect to turbidity, the standard is uniform throughout the state. Oregon law allows turbidity levels of no more than 10 percent above the

baseline turbidity level found "upstream of the turbidity causing activity." OAR 340-041-0036. This standard may be exceeded in limited cases, *e.g.*, in an emergency or to perform other essential activities, but only with proper approval and "provided all practicable turbidity control techniques have been applied[.]" *Id*.

23. Oregon's "Statewide Narrative Criteria" for water quality provides that "deleterious factors," including turbidity, must be maintained at their lowest possible levels regardless of the specific water quality standards established by regulation. OAR 340-041-0007(1). The narrative criteria also encourage coordination between federal, state, and local agencies to protect water quality, including by controlling turbidity, through efforts to regulate water flow. OAR 340-041-0008. In addition, the narrative criteria prohibit "[a]esthetic conditions offensive to the human senses of sight, taste, smell, or touch . . . ." OAR 340-041-0013.

24. In addition to its more specific water quality standards, Oregon's antidegradation policy requires governing bodies "to prevent unnecessary further degradation" and "ensure the full protection of all existing beneficial uses." OAR 340-041-0004(1).

**(The Corps failed to operate the Willamette Valley Project dams consistent with regulatory requirements)**

25. The 13 dams of the Upper and Lower Willamette River comprise the WVP.

26. The Corps is responsible to maintain and operate the WVP in compliance with all applicable laws and regulations. This includes the requirements of the CWA as well as the state water quality standards made applicable to federal agencies via the CWA.

27. Under the Endangered Species Act ("ESA"), the Corps must protect threatened species that reside in the waterways of the WVP. In 1999, the EPA listed two such species of fish as threatened under the ESA (the "threatened species"). In 2008, the National Marine

Page 6 –     COMPLAINT

Fisheries Service ("NMFS") issued a Biological Opinion ("the 2008 BiOp") regarding the WVP's impact on the threatened species.

28. In the 2008 BiOp, the NMFS identified two primary obstacles for the threatened species: (1) blocked passage through WVP dams, and (2) inadequate water quality in the Willamette Basin. To remedy these issues, the NMFS prescribed a series of Reasonable and Prudent Alternatives ("RPAs") that the Corps was expected to implement.

29. The Corps did not implement the RPAs identified in the 2008 BiOp. This failure by the Corps had several negative repercussions, including harm to the threatened species, extensive litigation, and fallout from the actions necessary to remediate the Corps' failure to act, including harm to its beneficial use in providing water supply for public, private, and industrial use.

30. In 2018, after a decade of inaction, environmental groups sued the Corps for violating the ESA.[2] In particular, they alleged that the Corps failed to implement the RPAs identified in the 2008 BiOp, harming the threatened species. The Court agreed, ruling in 2020 that the Corps violated the ESA by failing to implement the RPAs, causing ongoing harm to the threatened species.[3]

31. In 2021, the Court ordered the Corps to implement the 2008 RPAs. The Court further ordered that the Corps comply with the various water quality standards.[4] The Court was

---

[2] This action is *Nw. Env't Def. Ctr., et al. v. United States Army Corps of Eng'rs, et al.*, 3:18-cv-00437-HZ.

[3] *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs*, 479 F. Supp. 3d 1003, 1016 (D. Or. 2020).

[4] *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs*, 558 F. Supp. 3d 1056, 1076-79 (D. Or. 2021), *amended,* No. 3:18-CV-00437-HZ, 2021 WL 12319692 (D. Or. Sept. 21, 2021).

Page 7 –     COMPLAINT

explicit that the Corps must not violate the CWA and state water quality standards.[5] The Corps did so anyway.

32. To effect the 2008 RPAs, the Court required the Corps to implement plans developed by an Expert Panel convened by and subject to oversight by the Court. *Id*. at 1076-79, n.1. Again, the Court was explicit that the Corps must not violate "the various water quality standards governing the WVP." *Id*. at 1077. The Corps did so anyway.

33. Pursuant to the court-ordered, non-discretionary plan, the Corps was required to draw down the level of Green Peter Reservoir in November and December 2023.

34. The Corps was aware that the drawdown planned for November 2023 would cause elevated turbidity levels in the affected waterways. In fact, the Corps knew that its action would violate Oregon water quality laws and, in turn, the Court's order.

**(The 2023 drawdown resulted in highly turbid water, violating water quality standards and causing plaintiffs significant harm)**

35. As the Corps expected, the 2023 drawdown caused massively elevated turbidity levels in the South Santiam River, damaging Sweet Home's and Lebanon's municipal water supplies and treatment facilities, and threatening their ability to supply safe water. During the drawdowns, the turbidity levels were exponentially higher than normal and well beyond the levels allowed under Oregon's water quality standards.

36. During the 2023 drawdown of Green Peter Reservoir, for example, turbidity levels of the raw water intake at Sweet Home's water treatment facility were far in excess of normal levels. Between November 6 and December 15, 2023, a 39-day period, raw turbidity levels exceeded 50 NTUs on all but two days, exceeded 100 NTUs on 23 days, and exceeded

---

[5] *Id*. at 1075 (citation omitted) (observing that "a court may not command an agency to violate its other statutory obligations.").

Page 8 –     COMPLAINT

200 NTUs—a staggering increase—on three days. By contrast, during the same period in the two preceding years (2021 and 2022), turbidity levels were below 10 NTUs without exception.

37. In the same period, turbidity levels of the raw water intake at Lebanon's water treatment facility exceeded 50 NTUs every day, exceeded 100 NTUs on 29 days, and exceeded 200 NTUs—a staggering increase—on nine days. By contrast, during the same period in the two preceding years (2021 and 2022), turbidity levels were below 10 NTUs on all but two days, when they were below 11 NTUs.

**(Increased turbidity damaged Sweet Home's water treatment facility)**

38. The increase in turbidity and sediment load caused damage to Sweet Home's water treatment facility in 2023 and 2024, and will continue to do so. They caused sludge-blanket buildup in the settling basins, requiring the facility be shut down and drained. They also required an increased coagulant dose during the treatment process. Extreme spikes in turbidity made it particularly difficult to maintain appropriate coagulant levels, resulting in excessive backwashing and shorter filter runtimes. Though the facility was designed to be fully automatic, staff members were forced to manually operate it as a result of these challenges.

39. As a result of the 2023 and 2024 drawdowns, Sweet Home incurred significant expenses in order to provide safe drinking water to its residents. These included operating supplies, such as water treatment chemicals, and professional services.

40. To address the impact of the 2023 and 2024 drawdowns, and to address the Corps' threatened actions hereafter, Sweet Home will need to significantly modify its water treatment facility to ensure the safety of its municipal water supply.

**(Increased turbidity damaged Lebanon's water treatment facility)**

41. Lebanon's water treatment facility could not function as designed with the exponential increase in turbidity levels caused by the 2023 and 2024 drawdowns.

42. The exponential increase in turbidity and extreme sediment load caused by the drawdowns caused significant damages to Lebanon's water treatment facility, and will continue to do so. The increased turbidity created dangerous levels of pressure in the water treatment system.

43. As a result of the 2023 and 2024 drawdowns, Lebanon incurred significant expenses in order to provide safe drinking water to its residents. These included additional chemical, power, and labor costs required to operate the facility, and professional services. Lebanon was also forced to purchase replacement filters as well as backup filters in anticipation of future high-turbidity events resulting from future drawdowns planned by the Corps.

44. To address the impact of the 2023 and 2024 drawdowns, and to address the Corps' threatened actions hereafter, Lebanon will be forced to significantly modify its water treatment facility to ensure a safe municipal water supply.

### FIRST CLAIM FOR RELIEF
### (Administrative Procedures Act and Clean Water Act)

45. Plaintiffs incorporate by reference all allegations set forth herein.

46. The APA provides for judicial review of federal agency actions that were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

47. Pursuant to the CWA, each state must develop and implement water quality standards to protect and enhance water quality. The CWA further requires federal agencies to comply with those water quality standards.

48. Oregon law imposes water quality standards that are binding on federal agencies, including the Corps. Those standards require the Corps to protect waterways for their designated beneficial uses, meet numeric and narrative criteria, avoid unnecessary degradation of water quality, and comply with all water quality laws, regulations, and standards.

49. The Corps violated Oregon water quality standards when it drew down the Green Peter Reservoir in 2023 and 2024. On information and belief, the Oregon Department of Environmental Quality informed the Corps of these failures in a pre-enforcement notice.

50. Through the referenced drawdowns, the Corps unlawfully harmed plaintiffs' municipal water supplies and water treatment facilities, interfered with the designated beneficial uses of the South Santiam River, failed to maintain its numeric and narrative water quality criteria, and degraded its water quality.

51. The Corps further violated the Court order mandating that it comply with water quality standards governing the WVP.

52. The Corps violated the CWA and Oregon's water quality standards when drawing down Green Peter Dam in 2023 and 2024, and threatens to do so in the future. The Corps has also violated all of the above, and threatens to violate going forward, by drawing down the Green Peter Dam in a manner that is contrary to the Court order requiring it to comply all water quality laws, regulations, and standards.

53. The Corps' violations harmed plaintiffs, interfering with their ability to provide a safe water supply, damaging their water treatment facilities, forcing them to incur additional supply and labor costs, personnel costs, professional fees, and requiring modification, upgrades, and expansion of plaintiffs' water treatment facilities.

54. The Corps and the Court have indicated that the drawdowns at the Green Peter Reservoir will be an annual occurrence.

55. To meet future demand, comply with water quality standards, and ensure the safety of its personnel, Sweet Home and Lebanon will be required to expand and improve their

Page 11 –     COMPLAINT

water treatment facilities and incur additional operating expenses in order to provide a safe water supply to their residents. These improvements and expenses are the result of the Corps' actions.

56. Sweet Home and Lebanon are entitled to an award of damages, attorney fees, prejudgment and post-judgment interest, and costs in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Negligence *Per Se*)

57. Plaintiffs incorporate by reference all allegations set forth herein.

58. The CWA requires federal agencies to comply with state water quality standards.

59. The Corps, in drawing down Green Peter Reservoir in 2023 and 2024, failed to comply with Oregon's water quality standards, violating the Court's order and the CWA.

60. These violations injured plaintiffs and impaired their ability to provide a safe municipal water supply. Plaintiffs are of the class of persons that the CWA and Oregon's water quality standards are intended to protect.

61. The Corps' violations of the CWA and Oregon's water quality standards caused the type of harms that those laws are intended to prevent.

62. The Corps' conduct, as alleged and incorporated herein by reference, constitutes negligence *per se*.

63. As a direct and proximate result of the negligence *per se* of the Corps, plaintiffs have suffered property damages and other losses and are entitled to recover those damages as set forth above.

## THIRD CLAIM
### (Negligence)

64. Plaintiffs incorporate by reference all allegations set forth herein.

65. The Corps owed a duty to act in a non-negligent manner, including but not limited to complying with the referenced Court order, the CWA, and water quality laws and regulations.

Page 12 –     COMPLAINT

66. The Corps knew or should have known that, if it performed its duties negligently, it was foreseeable that plaintiffs, as municipalities who are duty-bound to provide safe drinking water to their communities, would be harmed.

67. The Corps breached its duty of care to plaintiffs by the conduct set forth herein.

68. As a direct, proximate, and foreseeable result of the Corps' negligence, plaintiffs have suffered losses and property damage and are entitled to recover those damages as set forth herein.

## DAMAGES
## (All Claims)

69. The damages sustained by Sweet Home include, in addition to those categories set forth herein in an amount to be proven at trial, the cost of additional operating supplies ($17,875.40), professional services ($20,924.43), and water treatment chemicals ($21,937.60) for the 2023 drawdown. To address extreme turbidity caused by future drawdowns, Sweet Home will be required to improve its water treatment plant by installing new backwash ponds, pumps, pre-filter pressure separators, and by modifying existing filters. These improvements are estimated to cost approximately $11,492,966.

70. The damages sustained by Lebanon include, in addition to those categories set forth herein in an amount to be proven at trial, the cost of additional labor ($10,796.38), power consumption ($13,811.71), and filtration supplies ($404,066.92) for the 2023 drawdown. To address extreme turbidity caused by future drawdowns, Lebanon will be required to improve its water treatment plant by adding a pretreatment system. This and other improvements are estimated to cost $26,283,000.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the entry of judgment against the Corps and that the following relief be granted:

A. Award all compensatory and economic damages sustained by each plaintiff in amounts to be determined at trial and as stated in plaintiffs' respective tort claim notices;

B. Award interest as to each plaintiff to the extent allowed by law;

C. Award attorney fees and costs to each plaintiff pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

D. Award discretionary costs; and

E. Such further relief as the Court deems just and proper to provide relief to plaintiffs and to protect the public interest.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand trial by jury in this action of all issues so triable.

DATED: October 1, 2025.   MARKOWITZ HERBOLD PC

*s/ Allison L. Rothgeb*
Kerry J. Shepherd, OSB #944343
KerryShepherd@MarkowitzHerbold.com
Allison L. Rothgeb, OSB #222086
AllisonRothgeb@MarkowitzHerbold.com
Kathryn P. Roberts, OSB #064854
KathrynRoberts@MarkowitzHerbold.com
*Attorneys for Plaintiff City of Lebanon and City of Sweet Home*

2290173.10

Page 14 –   COMPLAINT